Filed 1/15/15  P. v. Xulu CA2/3
## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B247575 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. KA096351) |
| v. | |
| THOMAS ALBERT XULU et al., | |
| Defendants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, George Genesta, Judge.  Affirmed.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant Thomas Albert Xulu.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant Carlos Manuel Cervera.

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Jose Roberto Guzman.

Kamala D. Harris, Attorney General, Lance E. Winters, Assistant Attorney General, Victoria B. Wilson and Carl N. Henry, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendants and appellants Thomas Albert Xulu, Carlos Manuel Cervera, and Jose Roberto Guzman were jointly tried and found guilty of premeditated attempted murder and of shooting at an occupied vehicle. Defendants' primary issues on appeal concern: (1) the sufficiency of the evidence to support their convictions for the crimes as aiders and abettors; (2) alleged instructional error on aiding and abetting; (3) the admissibility of statements under *Aranda-Bruton*;[1] (4) the admissibility of Cervera's post-arrest statement; and (5) prosecutorial misconduct.[2] Finding no reversible error, we affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.    Factual background.

####       A.    *The shooting on December 7, 2011.*

On December 7, 2011, at approximately 8:45 p.m., Steven Lopez was at the Metrolink train station in Baldwin Park. Nearby, a gold or orange car was parked, but its lights and engine were on. Four people were in the car, two in front and two in back. The car's rear driver-side passenger, who wore a Kings hat, yelled something that sounded like "king" or "clique" at Lopez. Thinking he was getting hit up by gang members, Lopez walked away. Ten to fifteen minutes later, the car left, turning onto Downing.

Lopez saw the orange car three to four minutes later,[3] but now a dark sport utility vehicle (SUV) was in front of it. The orange car pulled into the opposite lane of traffic so that it was alongside the SUV, and the orange car stayed there for about 30 seconds.

---

[1]    *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).

[2]    Each defendant joins the others' arguments, to the extent applicable.

[3]    Lopez's testimony is unclear whether he saw it three to four minutes later or six to ten minutes later.

While the orange car was alongside the SUV, Lopez heard two "popping" noises. The SUV slowed for a bit but then followed the orange car.

At this same time, 9:00 p.m., Juan Madrigal was in his black SUV in Baldwin Park, near the Metrolink station. He was on Pacific when an orange Toyota Matrix cut him off. The Matrix's rear driver-side passenger threw gang signs at Madrigal. Madrigal and the Matrix were on Bogart Avenue, when Madrigal heard gunshots. Angered, Madrigal followed the Matrix to get its license plate number. Madrigal heard another gunshot, which hit his windshield and headrest. When Madrigal heard the gunshot, he saw the Matrix's rear driver-side passenger stick his hand out of the window.

Officer Joseph Cota saw Madrigal's SUV and the orange car speeding, with Madrigal following the orange car. Officer Cota heard a loud bang, and then he saw the cars again. When he activated his lights, Madrigal stopped, but the orange car did not. Madrigal told Officer Cota that they were shooting at him. Madrigal was unsure how many people were in the car, but he thought it was full, and he told another officer that there were five people in the orange car.

B.      *The investigation and defendants' statements.*

Officer Adam Acuna drove with Madrigal to the areas where the incident took place. Outside defendant Xulu's house, which was near the train station, Madrigal saw a car that looked like the one involved in the shooting. Xulu told Officer Acuna that the car was his,[4] and he had the keys to the car in his pocket. Two unspent .45 caliber rounds were recovered from the car's back area. Xulu's sister told the officer that she saw the car at 9:15 p.m. going southbound on Downing.

Detective Jeffrey Honeycutt, the investigating officer, arrived at Xulu's house after midnight on December 8, 2011, approximately four hours after the shooting. Four men were in the garage, which was locked from the outside: defendant Cervera, defendant Guzman, Roger Mejia, and Erick Pineda.[5] Mejia wore a black Kings hat with

---

[4]      The car was registered to Xulu's mother.

[5]      Cervera was 27; Guzman was 20; Mejia was 16; and Xulu was 18.

3

a gray bill and a gray sweatshirt.  In the garage were .9 millimeter ammunition and a black LA Kings hat.  In Mejia's pants pocket were two live .9 millimeter rounds.

Xulu, Guzman, and Cervera gave statements to the police.  Xulu admitted he drove the car and was a KHA gang member known as Chaos.  Guzman admitted he was in the backseat, although he did not specify where.  Guzman also said he was a newly initiated KHA member known as Swifty or Mex.  When Officer Honeycutt asked Cervera if he was in the car, Cervera replied, "What am I supposed to do, sir?  Am I supposed to jump out head first?"

Pineda, who was not in the car, said that Cervera mentioned "shooting that guy" and bragged that he "dumped"—meaning shot at somebody.

A bullet went through Madrigal's front windshield and his headrest.  A spent bullet was recovered from Madrigal's car.  An expended .9 millimeter casing and an expended .45 caliber casing were found in the areas where the shootings occurred.  The casings were fired from different guns, suggesting that two guns were used to shoot at Madrigal.

Madrigal had no weapons on him or in his car.  Neither Madrigal nor Lopez was gang members.

C. *Gang evidence.*

Detective Esteban Mendez, a gang expert, testified for the People.  Gangs use fear and intimidation to control their territory.  Gang members go in to the territory of rival gang members to disrespect them by, for example, hitting people up or making their presence known.  Influential gang members coordinate "missions" to commit crimes.  Each member involved in the mission has a responsibility; for example, someone is the driver and another person holds the firearm or weapon.  The person in possession of a firearm runs from the car if there is a traffic stop.

There are different levels of status within a gang.  At the bottom are associates or affiliates who want to belong to the gang and actively put in work.  Next are soldiers or soldados, who comprise the majority of gang members.  The most influential members are shot callers.  A gang member enhances his or her reputation within the gang by

4

putting in work, that is, committing crimes. The more violent the crime, the more respect the gang member receives.

Kings Have Arrived (KHA or K-HA or Kings) is a Baldwin Park gang having over 100 documented members in 2011. The Metrolink train station in Baldwin Park is in a disputed area. KHA began as a tagging crew but evolved into a gang in early 2000. Common identifying symbols include a "K" followed by anything associated with royalty, for example, a king, a joker or a crown. KHA members wear Los Angeles Kings sports apparel. The gang's primary activities are murder, attempted murder, assault with a deadly weapon, possession of firearms in public places, robbery, grand theft auto, and felony vandalism.

Detective Mendez first had contact with Xulu in February 2011, at which time Xulu admitted he belonged to KHA. Xulu and Cervera have a "K" extending from their shoulders to elbows tattooed on their arms. Guzman has tattoos but Detective Mendez could not determine that Guzman is a KHA member based on them. Guzman did admit he was a KHA member when he was arrested. Mejia has a "K" written on his hand. Pineda, who was found in the garage with defendants, also has tattoos associated with KHA.

In Detective Mendez's opinion, Xulu, Cervera, and Guzman are KHA members. Based on a hypothetical modeled on the facts of the case, it is the detective's opinion that such crimes would be committed for the benefit of, or in association with, or at the direction of a criminal street gang.

## II. Procedural background.

On February 8, 2013, a jury found defendants guilty of count 1, premeditated attempted murder (Pen. Code, §§ 187, subd. (a), 664, subd. (a)),[6] and the jury found true principal gun use (§ 12022.53, subds. (b), (c) & (e)(1)) and gang (§ 186.22, subd. (b)1)(C)) allegations. The jury also found defendants guilty of count 2, shooting at an occupied vehicle (§ 246) and found true gang allegations (§ 186.22, subd. (b)(1)(B)).

---

[6] All further undesignated statutory references are to the Penal Code.

5

On March 11, 2013, the trial court sentenced each defendant to 27 years to life in prison (7 years to life on count 1 plus 20 years to life for the gun enhancement under section 12022.53, subdivisions (c) and (e)(1)). The court stayed under section 654 the sentences on count 2.

## DISCUSSION

**I. The evidence was sufficient to establish that defendants were liable as direct aiders and abettors.**

Guzman and Cervera contend there was insufficient evidence to support their convictions as aiders and abettors for premeditated, willful and deliberate attempted murder and for shooting at an occupied vehicle.[7] We disagree.

*Standard of review.*

In assessing the sufficiency of the evidence to support a conviction, "we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] 'Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]' [Citation.] A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial

---

[7] Although Xulu (the driver) has joined, to the extent applicable, any arguments raised by Guzman and Cervera, this issue requires separate briefing. The issue therefore has not been adequately raised by Xulu, and we do not address it as to him.

6

evidence to support" ' the jury's verdict. [Citation.]" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357; see also *Jackson v. Virginia* (1979) 443 U.S. 307; *People v. Snow* (2003) 30 Cal.4th 43, 66; *People v. Perez* (1992) 2 Cal.4th 1117, 1124.)

The People's theory of the case was Cervera and Guzman aided and abetted the crimes of premeditated attempted murder and of shooting at an occupied vehicle. "[P]roof of aider and abettor liability requires proof in three distinct areas: (a) the direct perpetrator's actus reus—a crime committed by the direct perpetrator, (b) the aider and abettor's mens rea—knowledge of the direct perpetrator's unlawful intent and an intent to assist in achieving those unlawful ends, and (c) the aider and abettor's actus reus— conduct by the aider and abettor that in fact assists the achievement of the crime. [Citation.]" (*People v. Perez* (2005) 35 Cal.4th 1219, 1225; see also *People v. McCoy* (2001) 25 Cal.4th 1111, 1116-1117; *People v. Prettyman* (1996) 14 Cal.4th 248, 259; § 31.)

One who aids and abets an attempted murder therefore must act "with knowledge of the criminal purpose of the perpetrator and with an intent or purpose either of committing, or of encouraging or facilitating commission of, the offense." (*People v. Beeman* (1984) 35 Cal.3d 547, 560, italics omitted; see also *People v. Lee* (2003) 31 Cal.4th 613, 623-624; *People v. Smith* (2005) 37 Cal.4th 733, 739.) An aider and abettor, however, need not personally act willfully, deliberately and with premeditation to be guilty of premeditated attempted murder. (*People v. Favor* (2012) 54 Cal.4th 868, 877; *Lee*, at p. 627.) Similarly, shooting at an occupied vehicle requires (1) acting willfully and maliciously and (2) shooting at an occupied vehicle. (§ 246; see *People v. Ramirez* (2009) 45 Cal.4th 980, 985.)

Factors that may be taken into account when determining whether a defendant was an aider and abettor are presence at the crime scene and companionship and conduct before and after the offense, including flight. (*In re Juan G.* (2003) 112 Cal.App.4th 1, 5.) But mere presence at the scene of a crime, knowledge of the perpetrator's criminal purpose or the failure to prevent the crime do not amount to aiding and abetting, although these factors may be taken into account in determining criminal responsibility. (*People v.*

7

*Garcia* (2008) 168 Cal.App.4th 261, 272-273; *People v. Nguyen* (1993) 21 Cal.App.4th 518, 529-530.) " 'Whether defendant aided and abetted the crime is a question of fact, and on appeal all conflicts in the evidence and reasonable inferences must be resolved in favor of the judgment.' [Citation.]" (*People v. Campbell* (1994) 25 Cal.App.4th 402, 409; *In re Juan G.*, at p. 5.)

Cervera and Guzman argue that the evidence shows only their "mere presence" in the car; it does not establish their intent or any act they engaged in to further the crimes. Intent, however, is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense. (*People v. Pre* (2004) 117 Cal.App.4th 413, 420.) Here, the evidence shows that Cervera and Guzman were with Xulu and Mejia at the Metrolink train station. Lopez, the young man who was waiting for his train, saw Xulu's car with four people in it. The rear driver-side passenger called out gang challenges to Lopez. Xulu's car remained idling for some minutes thereafter, but nobody took the opportunity to get out of the car and disassociate himself from the gang challenge. (See *In re Juan G., supra,* 112 Cal.App.4th at p. 5 [companionship before the offense is relevant to aider and abettor liability].)

Instead, minutes later, the rear driver-side passenger of Xulu's car threw gang signs at Madrigal. Xulu pulled into the opposite lane of traffic so that he could be alongside Madrigal, and a person or persons[8] in Xulu's car shot at Madrigal. When Officer Cota activated the lights on his police car, only Madrigal stopped. Xulu's car sped away. True, Cervera or Guzman were not in control of the car. Cervera and Guzman, however, did not return to the scene of the crime, and instead were discovered hours after the shooting not far away, in Xulu's locked garage with, among others, Mejia, who was also implicated in the crimes. Cervera's and Guzman's flight and companionship with Mejia and Xulu after the shooting show that they aided and abetted the crimes. (*In re Juan G., supra,* 112 Cal.App.4th at p. 5; *People v. Mason* (1991) 52 Cal.3d 909, 941 [it is reasonable to infer consciousness of guilt from flight].)

---

[8]     Madrigal saw the rear driver-side passenger put his hand out of the window when gunshots were fired.

Also, as to Cervera, he "bragged" about the shooting to Pineda, a fellow gang member who was also in Xulu's garage. Cervera argues that his statements, made *after* the shooting, are irrelevant to his intent and knowledge *prior to* the shooting and to establishing that he engaged in conduct to promote the crimes. The jury, however, could have reasonably inferred that one does not brag about an act one did not willingly participate in or approve of. In fact, Cervera's bragging is consistent with the gang expert's testimony that reputation is important to individual gang members, and reputation is created by putting in work.

Placing this crime in its gang context also supports Cervera's and Guzman's liability as aiders and abettors. Membership in a common gang may be relevant to motive and intent. (*People v. Garcia, supra,* 168 Cal.App.4th at pp. 277-278; but see *Mitchell v. Prunty* (9th Cir.1997) 107 F.3d 1337, 1342, overruled on another ground by *Santamaria v. Horsley* (9th Cir.1998) 133 F.3d 1242, 1248; *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1549-1551.) When gang challenges occur in the context of "modern gang warfare," "verbal taunting can quickly give way to physical violence and gunfire. . . . Given the great potential for escalating violence during gang confrontations," it is immaterial whether an aider and abettor specifically knew that the direct perpetrator had a gun. (*People v. Montes* (1999) 74 Cal.App.4th 1050, 1056; see *People v. Medina* (2009) 46 Cal.4th 913 [escalating violence is a foreseeable consequence in gang confrontations].)[9]

Cervera, Guzman, Xulu, and Mejia belonged to the same gang, KHA. Someone in Xulu's car issued a gang challenge to Lopez at the train station. When that gang challenge was issued, the potential for violence became a tangible thing. Yet, no defendant chose to get out of the car. Instead, all of them drove on and someone in that car again issued a gang challenge, this time to Madrigal. Coupling this evidence with the gang expert testimony, a reasonable jury could infer that these KHA gang members were

---

[9] The aider and abettor liability in *Medina* was premised on the natural and probable consequences doctrine, which is not at issue here.

looking for a violent confrontation. That there were two guns in Xulu's car buttresses that inference. While there is no direct evidence that either Cervera or Guzman knew of the guns or used them, the jury certainly could have reached that conclusion based on evidence that .45 rounds were found in the car, Mejia (a likely shooter) was arrested with .9 millimeter ammunition in his pocket, and that gang challenges were issued from an occupant or occupants of Xulu's car.

We therefore find that the evidence is sufficient to support Cervera's and Guzman's convictions as aiders and abettors.

## II. The aiding and abetting instruction.

The jury was instructed with CALCRIM No. 400: "A person may be guilty of a crime in two ways. One, he or she may have directly committed the crime. I will call that person the perpetrator. Two, . . . he or she may have aided and abetted a perpetrator who directly committed the crime. A person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." Defendants argue that this instruction improperly shifted or lessened the prosecution's burden of proof.[10] We disagree.

In *People v. Nero* (2010) 181 Cal.App.4th 504, 518, we found that an earlier version of CALCRIM No. 400 stating that the direct perpetrator and the aider and abettor are "equally guilty" can be "misleading," because an aider and abettor may be guilty of a greater or a lesser offense than the direct perpetrator is guilty of. (See also *People v. McCoy, supra,* 25 Cal.4th 1111; *People v. Samaniego* (2009) 172 Cal.App.4th 1148.) Thereafter, the Legislature addressed our concern by modifying CALCRIM No. 400 to omit the word "equally." (*People v. Lopez* (2011) 198 Cal.App.4th 1106, 1119, fn. 5 [noting that CALCRIM No. 400 has been amended].) The trial court here gave that modified version.

---

[10] Although defense counsel did not object to the instruction, we address the issue on appeal. Because we conclude that the trial court did not err by instructing the jury with CALCRIM No. 400, we do not address Guzman's alternative contention that his trial counsel provided ineffective assistance by failing to object to the instruction.

10

The modified CALCRIM No. 400, quoted above, correctly stated the general legal requirements for aiding and abetting liability, including that a "person is guilty of a crime whether he or she committed it personally or aided and abetted the perpetrator." Nothing in the instruction dictates that an aider and abettor must be found guilty of the identical crime as the direct perpetrator. To the contrary, CALCRIM No. 401 explains that the jury may find aider and abettor liability only when the aider and abettor "knows of the perpetrator's unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime." This instruction clarified what the jury needed to find as to each defendant to convict him as an aider and abettor. We therefore also reject the specific argument that CALCRIM No. 400 is problematic because it allowed defendants to be found guilty of premeditated attempted murder based on the shooter's mental state without requiring the jury to find that each defendant himself premeditated or intended to aid and abet premeditated attempted murder.

In any event, an aider and abettor "need not share the heightened mental state of the direct perpetrator for the applicability of section 664(a)'s penalty provision. [Citation.] Once the jury finds that the murder attempted was deliberate and premeditated, both the direct perpetrator and the aider and abettor are subject to section 664(a)'s penalty provision." (*People v. Favor, supra,* 54 Cal.4th at p. 879; see also *People v. Lee, supra,* 31 Cal.4th at p. 627 ["section 664(a) properly must be interpreted to require only that the murder attempted was willful, deliberate, and premeditated, but not to require that an attempted murderer personally acted with willfulness, deliberation, and premeditation, even if he or she is guilty as an aider and abettor"].)

We therefore conclude that nothing in the instructions created a reasonable likelihood the jury believed that Xulu, Guzman, and Cervera had to be found "equally" guilty or that giving CALCRIM No. 400 was otherwise error. (*People v. Lopez, supra,* 198 Cal.App.4th at p. 1119 [jurors are presumed able to understand and to correlate instructions].)

11

### III. *Aranda-Bruton.*

The trial court admitted Pineda's statement that Cervera, who did not testify, said, "they dumped." Guzman and Xulu contend that admitting Cervera's statement violated their Sixth Amendment rights to confrontation and to cross-examine witnesses. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; *Bruton, supra,* 391 U.S. 123; *Aranda, supra,* 63 Cal.2d 518.) We find that any error in admitting the statement was harmless.

#### A. *Additional facts.*

Defendants filed pre-trial motions to exclude statements they made implicating each other and/or to sever their trials. The trial court indicated that if it admitted Cervera's statements, the court would give a limiting instruction. The issue came up again during Pineda's testimony, when Guzman's and Xulu's counsel objected to any part of Cervera's statement referencing "they," "these" or "them." The court again found that such a statement was admissible, but "it's limited to Mr. Cervera."

On direct examination, Officer Honeycutt testified that Mejia and Pineda and defendants Cervera and Guzman were locked in Xulu's garage. Pineda told the officer that Cervera bragged about the shooting.[11] Counsel asked whether Officer Honeycutt ascertained who "dumped," that is, who was the shooter: "Did Erick Pineda say nah, as in he's [(Cervera)] the one that dumped?" Officer Honeycutt answered, "Yes."

Counsel for Cervera then cross-examined Officer Honeycutt. Counsel asked whether "[b]ragging just means talking about it, correct?" The officer answered: "Yes, and I remember asking him bragging as [if] he's the one that dumped? And he said something to the effect of no, bragging as if *they dumped* or something like that." (Italics added.) The trial court, which had earlier overruled Guzman's objections to any statement referencing "they," overruled Xulu's counsel's motion to strike.

At the conclusion of Officer Honeycutt's testimony, the court instructed the jury: "[Y]ou have heard evidence that the defendants made statements out of court. You may

---

[11] Pineda testified, but denied knowing Cervera and having any recollection of the conversation in the garage.

consider that evidence only against the defendant making the statement. Not against any other defendant. [¶] You've also heard evidence of statements made by Erick Pineda to Detective Honeycutt. You may consider that evidence only against defendant Carlos Cervera. Not against any other defendant." The trial court gave similar limiting instructions before the jury retired for deliberations.[12]

### B.    *Any Aranda-Bruton error was harmless.*

The federal and state Constitutions guarantee a criminal defendant the right to confront and to cross-examine witnesses against him or her. (U.S. Const., 6th & 14th Amends.; Cal. Const., art. I, § 15.) A defendant's confrontation rights may be violated by the admission of a nontestifying codefendant's confession that implicates the defendant. (*Bruton, supra,* 391 U.S. at pp. 135-136; *Aranda, supra,* 63 Cal.2d at pp. 530-531.) To avoid a confrontation problem, defendants may be tried separately. (*Aranda*, at pp. 530-531.) Another solution is to redact from the nontestifying codefendant's confession or statement any reference to the defendant's existence. (*Richardson v. Marsh* (1987) 481 U.S. 200, 211 (*Richardson*).)

In *Richardson*, three people (Marsh, Williams, and Martin) participated in a robbery and murders. (*Richardson*, *supra*, 481 U.S. 200.) Marsh and Williams were jointly tried for the crimes. Williams did not testify, but his prior statement that he and Martin, while in a car en route to the victims' home, discussed robbing and killing the victims was admitted. (*Id.* at p. 203.) All references to Marsh's presence in the backseat of the car were omitted. Marsh, however, testified and admitted she was in the car during the discussion but denied hearing it because of the loud music playing. (*Id.* at p. 204.)

*Richardson* held that admitting Williams's confession did not violate *Bruton*, because the confession was not incriminating on its face but became so only when linked

---

[12]    The court instructed with CALCRIM No. 303: "During the trial certain evidence was admitted for a limited purpose. You must consider that evidence only for that purpose and for no other."

The court also told the jury: "I instructed you during the trial that certain evidence was admitted only against a certain defendant. You must not consider that evidence against any other defendant."

13

with other evidence introduced at trial, namely, Marsh's own testimony. (*Richardson, supra,* 481 U.S. at p. 208.) "Where the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence. Specific testimony that 'the defendant helped me commit the crime' is more vivid than inferential incrimination, and hence more difficult to thrust out of mind. Moreover, with regard to such an explicit statement the only issue is, plain and simply, whether the jury can possibly be expected to forget it in assessing the defendant's guilt; whereas with regard to inferential incrimination the judge's instruction may well be successful in dissuading the jury from entering onto the path of inference in the first place, so that there is no incrimination to forget." (*Ibid*.)

Notwithstanding *Richardson*'s "evidentiary linkage" test, our California Supreme Court interpreted *Richardson* as holding that a defendant's confrontation rights can still be violated even if the codefendant's statement only becomes incriminatory based on linkage to other properly admitted evidence. (*People v. Fletcher* (1996) 13 Cal.4th 451 (*Fletcher*).) The specific issue in *Fletcher* was whether a confrontation problem can be avoided by replacing all references to the nondeclarant's name with pronouns or similar neutral terms.[13] (*Id.* at p. 456.) In *Fletcher*, Moord and Fletcher were jointly tried for murder and attempted robbery. The evidence was that two men, pretending to have car trouble, got the victim to stop and help them. When the victim drove away, one of the men shot her. After his arrest, Fletcher told a fellow inmate that " 'he and a friend' " used a ruse to get people to stop, and he shot a woman as she drove away. (*Id.* at p. 458.)

Although Fletcher's statement did not identify Moord by name, *Fletcher* found that admitting Fletcher's statement violated Moord's confrontation rights. The statement informed the jury that Fletcher and another man were present at the scene of the crime. (*Fletcher, supra,* 13 Cal.4th at p. 469.) Because other evidence placed Moord in

---

[13]     *Fletcher* noted that such a redacted confession is facially incriminating because it, without reference to other evidence, incriminates another person other than the confessing codefendant. (*Fletcher, supra,* 13 Cal.4th at p. 456.) It is not facially incriminating because it does not identify that other person by name. (*Ibid.*)

14

Fletcher's company just moments after the shooting, "reasonable jurors could not avoid drawing the inference" that Moord was the "friend." (*Ibid.*) Although it was only by reference to other evidence that Moord became identifiable as the "friend," Moord's confrontation rights were violated.

*Fletcher* did not, however, hold that such edits will always be insufficient. Rather, the sufficiency of editing a nontestifying codefendant's statement to substitute pronouns or neutral terms for the defendant's name is determined on a case-by-case basis, in light of the statement as a whole and the other evidence presented at trial. (*Fletcher, supra,* 13 Cal.4th at p. 468; see also *Gray v. Maryland* (1998) 523 U.S. 185, 195 ["[C]onsidered as a class, redactions that replace a proper name with an obvious blank, the word 'delete,' a symbol, or similarly notify the jury that a name has been deleted are similar enough to *Bruton*'s unredacted confessions as to warrant the same legal results"].) If any reasonable juror would "inevitably perceive that the defendant on trial is the person designated by [the] pronoun or neutral term in the codefendant's confession," the confrontation clause is violated. (*Fletcher,* at p. 466.) A confession, for example, that is redacted with neutral pronouns may violate the confrontation clause if the confession "contains references to distinctive clothing, mannerisms, place of residence, or other information that readily and unmistakably identifies the person referred to as the nondeclarant defendant." (*Id*. at pp. 465-466.)

Here, Cervera's statement, "they dumped," did not inevitably refer to Xulu or Guzman. "[A] confession that is redacted to substitute pronouns or similar neutral and nonidentifying terms for the name of a codefendant will be sufficient if the codefendant was just one of a large group of individuals any one of whom could equally well have been the coparticipant mentioned in the confession." (*Fletcher*, *supra,* 13 Cal.4th at p. 466; see also *People v. Lewis* (2008) 43 Cal.4th 415, 467 [suggesting that when a redacted confession avoids a " 'one-to-one correspondence' " between the confession and an easily identifiable defendant, the confrontation clause is not violated], overruled on other grounds by *People v. Black* (2014) 58 Cal.4th 912, 919.) In *U.S. v. Chrismon* (7th Cir. 1992) 965 F.2d 1465, for example, three men were arrested after being found in

a trailer with illegal drugs. One defendant argued that statements referring to " 'you guys' " and " 'they' " directly referred to the three men and should have been excluded under *Bruton*. (*Id.* at pp. 1468, 1471.) The court found that no violation of the defendant's confrontation rights occurred, because the statement did not directly implicate the defendant. Other evidence showed that possibly more than just the three men were involved in selling drugs; for example, there was another man who acted as a supervisor and others worked at the trailer in shifts. (*Id.* at p. 1472.) Therefore, a connection to the complaining defendant was not "inevitable." (*Ibid.*)

Similarly, who "they" referred to was ambiguous. "They" had multiple interpretations. It could refer to any of the individuals in that garage or the car—Xulu, Guzman, Cervera or Mejia. It could refer to any combination of those individuals. Or it could refer to all of them, including Cervera.

That "they" might refer to Xulu and/or Guzman was based on linkage to other properly admitted evidence. Xulu was found outside his house, near the orange car, with the car's keys in his pocket. Locked in his garage were Guzman, Cervera, and Mejia. Mejia matched the description of the rear driver-side passenger. Xulu admitted he was the driver. Guzman admitted he was in the backseat of the car, and Cervera gave a statement strongly suggesting that he too was in the car ("What am I supposed to do? Jump out head first?"). Therefore, although other evidence placed Xulu and Guzman in the car, "they dumped" did not inevitably refer to them.

In any event, even assuming Cervera's statement should have been excluded, its admission was harmless beyond a reasonable doubt under the standard in *Chapman v. California* (1967) 386 U.S. 18. (See *People v. Jennings* (2010) 50 Cal.4th 616, 652 [applying *Chapman* standard of review to alleged *Aranda-Bruton* error].) First, as we have said, "they dumped" did not identify the shooter or shooters. (Cf. *Fletcher, supra,* 13 Cal.4th at p. 456 [editing, such as use of a pronoun, is insufficient to avoid a confrontation violation if, despite the editing, the jurors "could not avoid drawing the inference that the defendant was the coparticipant designated" by the pronoun].) Indeed, the prosecutor conceded she could not prove which defendant was the shooter. Rather,

there were four to five people in the orange car.  Two guns were used, because .45 caliber and .9 caliber expending casings were recovered from the crime scene.  Therefore, there were one or more shooters in the orange car.  Evidence suggested that the rear driver-side passenger was one of the shooters, if not the sole shooter, and other evidence strongly suggested that Mejia was this person.[14]  "They dumped" did not unambiguously identify Xulu and Guzman as shooters.

Second, "they dumped" was not a compelling piece of evidence furthering the prosecution's theory of liability.  Compare this case again with *Fletcher*.  Fletcher and Moord found a taxi left on a freeway on-ramp.  (*Fletcher, supra,* 13 Cal.4th at p. 457.)  The victim was passing by when she saw them and stopped to see if she could help.  After Fletcher shot the victim, the other man (inferentially, Moord) said " 'Oh, no.' "  (*Ibid*.)  This evidence raised an issue whether Moord, the nonshooter, entertained a culpable criminal intent.  (*Id.* at p. 456.)  Fletcher's statement that "he and a friend" were involved in a ruse to rob people was so "strongly incriminating" because, but for the statement, the jury might have concluded that Moord's only intent was to take the taxi and not to rob passersby.  (*Id.* at pp. 469-470.)

In contrast, "they dumped" added little, if anything to the critical issues before the jury.  Rather, the prosecutor conceded she could not prove that a specific defendant was a shooter, that is, a direct perpetrator.  The case against defendants therefore was predicated on a direct aider and abettor theory of liability.  "They dumped" does not evidence Xulu's or Guzman's knowledge of a shooter's unlawful intent and an intent to assist in achieving those unlawful ends.  The statement also does not specify what conduct Xulu and Guzman engaged in to assist the achievement of the crimes.  In short, "they dumped" does not establish how Xulu or Guzman aided and abetted the crimes.  It is not a

---

[14]     Mejia wore clothing matching the description of the rear driver-side passenger and he had .9 millimeter ammunition in his pocket.

17

statement that powerfully incriminates them. Its admission, if error, was therefore harmless.[15]

**IV.    The admissibility of Cervera's entire statement under Evidence Code section 356.**

At trial, Officer Honeycutt testified that he asked Cervera if he was in the car, and Cervera answered, " 'What am I supposed to do, sir?  Am I supposed to jump out head first?' "  Cervera argues that admitting only this select statement left the misimpression that he made a single flippant remark admitting he was in the car at the time of the shooting, when the entirety of his statement showed he had nothing to do with the shooting and had no idea what was going on.[16]  Cervera therefore contends that his Fifth, Sixth, and Fourteenth Amendment rights to due process and a fair trial were violated by the court's refusal to admit, under Evidence Code section 356, his other exculpatory statements.  We disagree.

Evidence Code section 356 allows the entirety of a statement to be admitted where it is about the same subject as the part of the statement.  Section 356 thus provides: "Where part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by an adverse party; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."  " 'The purpose of this section is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed.'

---

[15]    Because we hold that any error was not prejudicial, we do not address any contention concerning the statement's admissibility under an exception to the hearsay rule.

[16]    Before trial, Cervera moved to admit the videotaped statement he made to the police after his arrest.  In that statement, Cervera intimated he was in the car but denied knowing that anybody in the car was going to commit a crime.  The People objected to the statement's admission on the ground it was hearsay.  The trial court ruled that the statement was inadmissible.

[Citations.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 460; see also *People v. Zapien* (1993) 4 Cal.4th 929, 959 [in applying Evidence Code section 356, courts do not draw narrow lines around the exact subject of inquiry].) The section applies only to "statements that have some bearing upon, or connection with, the portion of the conversation originally introduced. [Citation.] Statements pertaining to other matters may be excluded." (*People v. Samuels* (2005) 36 Cal.4th 96, 130; see also *People v. Vines* (2011) 51 Cal.4th 830, 861.)

In *Vines*, for example, the defense introduced a portion of Proby's statement that he and Blackie committed the robbery. (*People v. Vines*, *supra*, 51 Cal.4th at p. 859.) *Vines* held that it was not error to permit the prosecution to admit another portion of Proby's statement that the defendant also participated in the robbery. "This case exemplifies the policy underlying the code section. Defendant wanted to rely on a part of Proby's statement to imply that Blackie was the shooter, which was contrary to what Proby actually said elsewhere in his statement. The rule of completeness exists to prevent such a misuse of evidence." (*Id.* at p. 861.)

But portions of a conversation that do not clarify or explain the portions that were admitted may be excluded in the trial court's discretion.[17] (*People v. Williams* (2006) 40 Cal.4th 287, 319.) Where, for example, the prosecution admitted an excerpt of defendant's post-arrest statement to show he was rational and killed the victims because they " 'screwed' " with him, it was not error to exclude defendant's expressions of remorse because they were irrelevant to show his state of mind at the time he committed the crimes. (*People v. Pearson, supra,* 56 Cal.4th at pp. 460-461.)

Here, the prosecutor introduced Cervera's statement, "What am I supposed to do? Jump out head first?" This statement tended to show that Cervera was in Xulu's car. The remainder of Cervera's statement that he admitted pertained to other matters; namely,

---

**17** We review this evidentiary ruling for an abuse of discretion, not under a de novo standard as suggested by Cervera.

Cervera's knowledge about what was going to happen in that car.[18] Whether Cervera was in the car and what he knew, however, were two different matters. Excluding Cervera's statements that he had "nothing to do" with what happened did not mislead the jury on the discrete issue of whether Cervera was in the car. The trial court therefore did not abuse its discretion in excluding the remainder of Cervera's statement.

Nor did exclusion of the evidence violate Cervera's due process right to present a defense. Application of the ordinary rules of evidence generally does not impair a defendant's due process right to present a defense. (*People v. Gonzales* (2012) 54 Cal.4th 1234, 1258-1259; *People v. Lucas* (1995) 12 Cal.4th 415, 464-465 [rejecting claim that the exclusion of hearsay evidence amounted to a denial of due process].) Cervera's statement was inadmissible as hearsay and, as we have said, it was not admissible, in the trial court's discretion, under Evidence Code section 356. (*See People v. Gurule* (2002) 28 Cal.4th 557, 605 ["The 'fuller picture' defendant argues should have been presented to the jury consisted of self-serving hearsay not otherwise admissible at trial. [Citation.] Defendant was free to present this information by taking the stand himself"].)

We therefore conclude that Cervera's constitutional rights were not violated by the exclusion of his statement.

## V.     Prosecutorial misconduct.

Defendants contend that the prosecutor committed prejudicial misconduct by arguing that the defense had the burden of proof. We disagree.

"The applicable federal and state standards regarding prosecutorial misconduct are well established. ' "A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.]

---

[18]     Cervera said, for example, "This has nothing to do with me"; "I was drinking with friends. Fuckin whatever happened after that that's on them. That has nothing to do with me"; "I'm not involved in this"; and "I didn't even have no idea what was going on, sir. I'm not even the driver."

Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—and on the same ground—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.] Additionally, when the claim focuses upon comments made by the prosecutor before the jury, the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion. [Citation.]" (*People v. Samayoa* (1997) 15 Cal.4th 795, 841.)

During closing argument, the prosecutor here said: "I just want to touch on the evidence briefly before I move on. You have to think of it in terms of how could it be a coincidence because that's how the defense is going to term all of this. Coincidentally or as a result of *but where's the evidence to back that up*? How is it that on this night defendant Xulu who doesn't have a car, who doesn't drive decides to take his mother's car and at least three other occupants to go into either rival territory or disputed gang territory. *There's no lawful purpose that's been proved in this case*." (Italics added.)[19]

It is improper for the prosecutor to misstate the law generally, and in particular, to attempt to lower the burden of proof. (*People v. Williams* (2009) 170 Cal.App.4th 587, 635, citing *People v. Hill* (1998) 17 Cal.4th 800, 829.) To the extent, if any, the prosecutor's comments here suggested that defendants had the burden of proving anything, the comments were harmless. First, in context, the prosecutor was arguing that the evidence showed that defendants were together that night for an illegal purpose rather

---

[19] Xulu's defense counsel objected to the statement on the ground that it was "burden shifting." The trial court found that the statement "may have been inarticulate in terms of expression of that but . . . there's an absence of other direction of driving be it to McDonald's, Wienerschnitzel or even Little Ceasar's. We just have a car parked in Metrolink station for a period of time according to Mr. Lopez and he actually kept observation but it just sort of sat there. So it had no apparent direction which is fair comment."

than out of coincidence. A prosecutor is given wide latitude during closing argument to make fair comment on the evidence, including reasonable inferences or deductions to be drawn from it. (*People v. Collins* (2010) 49 Cal.4th 175, 213.)

Second, if the comments could be interpreted to suggest that defendants had the burden of proving they were together that night for a lawful purpose, the comments were isolated and certainly do not comprise a pattern of conduct so egregious as to infect the trial with such unfairness as to make the convictions a denial of due process or to make it reasonably probable a more favorable outcome would have resulted. (See *People v. Samayoa, supra,* 15 Cal.4th at p. 841; *People v. Ellison* (2011) 196 Cal.App.4th 1342, 1352-1353 [prosecutor's improper argument that the jury had to determine whether the defendant's innocence was reasonable was harmless error]; cf. *People v. Hill, supra,* 17 Cal.4th 800 [multiple, egregious instances of misconduct constituted a denial of due process].)

Finally, the jury received proper instruction on the burden of proof via CALCRIM No. 220. We presume the jury followed this instruction. (See, e.g., *People v. Lopez, supra,* 198 Cal.App.4th at p. 1119.)

## VI.    Cumulative error.

Defendants contend that the cumulative effect of the purported errors deprived them of a fair trial. As we have " 'either rejected on the merits defendant's claims of error or have found any assumed errors to be nonprejudicial,' " we reach the same conclusion with respect to the cumulative effect of any purported errors. (*People v. Cole* (2004) 33 Cal.4th 1158, 1235-1236; see also *People v. Butler* (2009) 46 Cal.4th 847, 885.)

## VII.    Ineffective assistance of counsel.

Because we have not based any of our conclusions on forfeiture and have found any error to be harmless, we need not address defendants' alternative argument that trial counsel provided ineffective assistance of counsel by failing to preserve a claim for appeal.

**VIII.** *Pitchess***.**

Before trial, defendants sought discovery of Officer Acuna's, Officer Mendez's, and Detective Honeycutt's personnel records, under *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*). Xulu, for example, sought information related to "acts of aggressive behavior, violence, excessive force, or attempted violence or excessive force, racial bias, gender bias, ethnic bias, sexual orientation bias, coercive conduct, violation of constitutional rights, fabrication of charges, fabrication of evidence, fabrication of reasonable suspicion and/or probable cause, illegal search/seizure; false arrest, perjury, dishonesty, writing of false reports, writing of false reports to cover up the use of excessive force, planting of evidence, false or misleading internal reports including but not limited to false overtime or medical reports, and any other evidence of misconduct amounting to moral turpitude . . . ."

On October 23, 2012, the trial court conducted an in-camera review and concluded that no discoverable material existed. Defendants request that we review the sealed transcript of the trial court's *Pitchess* review to determine whether the court abused its discretion by failing to order disclosure of information. (See generally, *People v. Mooc* (2001) 26 Cal.4th 1216; *People v. Myles* (2012) 53 Cal.4th 1181, 1208-1209.) Trial courts are vested with broad discretion when ruling on motions to discover peace officer records (*People v. Samayoa, supra,* 15 Cal.4th at p. 827; *Haggerty v. Superior Court* (2004) 117 Cal.App.4th 1079, 1086), and we review a trial court's ruling for abuse (*Mooc,* at p. 1228; *People v. Hughes* (2002) 27 Cal.4th 287, 330).

We have reviewed the sealed transcript of the in-camera hearing conducted on October 23, 2012. That transcript constitutes an adequate record of the trial court's review of documents provided to it, and reveals no abuse of procedure or of discretion. (*People v. Myles*, *supra*, 53 Cal.4th at pp. 1208-1209; *People v. Mooc, supra*, 26 Cal.4th at p. 1228; *People v. Hughes*, *supra,* 27 Cal.4th at p. 330.)

**IX.    The 20-year sentence for the vicarious gun use enhancement.**

A 20-years-to-life sentence was imposed on each defendant for use of a firearm by a principal under section 12022.53, subdivision (e)(1), also referred to as the vicarious

23

gun use enhancement. Xulu contends that the enhancement violates federal and state constitutional guarantees of equal protection and due process. We disagree.

Section 12022.53, subdivision (e)(1),[20] authorizes an enhanced sentence to be imposed on an aider and abettor if a criminal street gang allegation is pled and proved. (*People v. Garcia* (2002) 28 Cal.4th 1166, 1171, 1176*; People v. Gonzales* (2001) 87 Cal.App.4th 1, 11-12; *People v. Hernandez* (2005) 134 Cal.App.4th 474, 480.) *Gonzales* rejected equal protection and due process challenges to the statute. As to the claim that the section violates equal protection because it treats aiders and abettors of gang crimes differently than other aiders and abettors, *Gonzales* found that the two types of aiders and abettors are not similarly situated. (*Gonzales*, at p. 13.) "Unlike other aiders and abettors who have encouraged the commission of a target offense resulting in a murder, defendants committed their crime with the purpose of promoting and furthering their street gang in its criminal conduct." (*Ibid.*; see also *Hernandez*, at pp. 481-482.) As to the claim that the section violates due process rights, *Gonzales* found that section 12022.53, subdivision (e) is "expressly drafted to extend the enhancement for gun use in any enumerated serious felony to gang members who aid and abet that offense in furtherance of the objectives of a criminal street gang. Section 12022.53, subdivision (e) is precisely the clear expression of legislative intent to extend an enhanced penalty to aiders and abettors . . . ." (*Gonzales,* at p. 15; accord *Hernandez*, at p. 483.)

We agree with *Gonzales*. We therefore reject defendants' contention.

---

[20] Subdivision (e)(1) of section 12022.53 provides: "The enhancements provided in this section shall apply to any person who is a principal in the commission of an offense if both of the following are pled and proved: [¶] (A) The person violated subdivision (b) of [s]ection 186.22. [¶] (B) Any principal in the offense committed any act specified in subdivision (b), (c), or (d)."

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KITCHING, Acting P. J.


KUSSMAN, J.*

---

\* Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.